CASE 98—PROSECUTION AND CONVICTION FOR MANSLAUGHTER—OCT. 29.

# Lindle and Others v. Commonwealth.

APPEAL FROM HOPKINS CIRCUIT COURT.

DEFENDANTS CONVICTED AND APPEAL.    REVERSED.

CRIMINAL LAW—CONTINUANCE—DECLARATIONS AS EVIDENCE—AFFIDA-
VIT FOR CONTINUANCE ADMITTED AS DEPOSITION—ATTEMPT TO DIS-
CREDIT AFFIDAVIT—KILLING BY OFFICER IN MAKING ARREST—SELF
DEFENSE—INSTRUCTIONS TO JURY.

Held:    1. Defendants were entitled to a continuance where they
were taken by surprise by the action of the prosecution in
summoning a large number of witnesses, whose names did not
appear at the foot of the indictment, as substantially all the
witnesses for the prosecution belonged to a miners' union to
which deceased belonged, and all had taken part in the acts
and demonstrations of that order which culminated in the
killing, and defendants, if given time, would have been able
to ascertain the character and antecedents of these witnesses,
many of whom were strangers in the community.

2. It was not error to refuse to permit defendants to file a supple-
mental affidavit for a continuance where no sufficient reason
was given why the facts contained therein were not set out
in the original affidavit, and, besides, the testimony of the wit-
ness on account of whose absence defendants, by their affidavit,
sought a continuance, would have been cumulative merely.

3. As defendants, at the time of the killing, were attempting, as a
deputy sheriff and his posse, to arrest deceased and other
leaders of a marching body of men, whose purpose was sup-
posed to be to induce or compel the miners at work in certain
coal mines to quit their work, it was competent for the prose-
cution to prove that certain persons appointed deputy sheriffs,
including one of the defendants, had prior to their appointment
been employed as guards by certain coal companies.

4. Declarations of various members of the miners' union as to the
plans and purposes of the order, made prior to the killing, and
declarations made by them to non-union miners, that if they
did not cease to work peaceably they would be forced to do so,
were admissible for defendants.

5. Defendants should have been permitted to prove a contract be-
tween the union miners and the operators in neighboring coun-

Lindle et al. v. Commonwealth.

ties which furnished a motive on the part of the union miners for closing the mines in the county where the killing occurred.

6. It was competent for defendants to prove that certain leaders of the order were armed when coming from the scene of the conflict.

7. Defendants having been refused a continuance on condition that the statements of the affidavit for a continuance as to the testimony of certain absent witnesses should be read as their depositions, which was done, it was error to permit the Commonwealth's attorney, at the close of all of defendants' testimony, to recall defendants, and ask them if they did not in their affidavit state that certain other witnesses would not prove certain facts, reading aloud from the affidavit to show what those facts were, and then ask them if those witnesses who had not been introduced were not present; the manifest purpose being to discredit the parts of the affidavit which had been read as the depositions of absent witnesses.

8. It was error to permit the prosecuting attorney to state to the jury the motives which prompted him to consent to the reading of the affidavit as the testimony of absent witnesses.

9. Questions as to the relative rights of the union miners to assemble and march in a peaceable manner, and of the right of the operators of the mines to protect their property from violence and invasion, should not have been submitted to the jury.

10. It was error to give an instruction which ignored the theory of the defense that defendants were acting as officers in the discharge of what they conceived to be their official duty.

11. If an officer in making an arrest for a felony is forcibly resisted, he is not limited to such force as is necessary to protect himself from death or great bodily harm, but may stand his ground, and use such force as is necessary, or apparently necessary, to overcome the resistance offered, even to the extent of taking life.

12. It was error to instruct the jury that they must believe from the evidence that the union miners had banded themselves together and gone forth for the purpose of alarming, intimidating and disturbing others, or for the purpose of injuring or destroying property, before it was lawful for defendants to arrest or disperse them; as the question was not what the jury might believe the purpose of the miners to have been, but what the defendants as officers believed, and had reasonable grounds to believe, their purpose to be, at the time of the attempted arrest.

13. If the deputy sheriff in good faith believed, and had reasonable grounds to believe, that deceased and his companions had band-

ed themselves together and gone forth armed, for the purpose of alarming, intimidating or injuring any person, he and his posse had the right, without a warrant, to arrest them, and to use such force as was reasonably necessary to effect that purpose, and, if deceased and those with him resisted arrest, it was lawful for defendants to shoot them if necessary to make the arrest; and it was error, in instructing the jury, to make the right of defendants, under the circumstances, to use such force as reasonably appeared to be necessary to make the arrest, depend upon the fact that deceased or his companions had first assaulted them, as it was only in the event that defendants did not in good faith believe that deceased and his companions had gone forth armed for the purpose of intimidating or injuring some person or persons that they were placed in the position of private persons as to the right of self-defense.

WADDELL & PRATT, J. F. DEMPSEY, OLLIE M. JAMES, J. F. GORDON AND GORDON & GORDON FOR APPELLANT.

The appellants, J. B. Lindle, Wade McIntosh and Ed Johnson, at the May term, 1901, of the Hopkins circuit court, were convicted of manslaughter and their punishment fixed at two years each in the penitentiary. To reverse this judgment this appeal is prosecuted.

## THE FACTS.

Some time in November, 1900, one J. D. Wood, president of the United Mine Workers, came to Hopkins county, issued his imperial mandate to the contented miners to obey him, to cease their employment and go upon a strike and join the order of which he was president. Agitators came from other counties and other States, and they sought by every sort of deviltry to put the miners in fear, telling them the mines would be dynamited, that they would be fired upon from ambush, their homes blown up, that the United Mine Workers were coming in great numbers and would take them out by force, and even kill those who refused to obey; that they would then reorganize the miners and none of them would be given employment. The foreign agitators had flooded the county with a lot of depraved and desperate characters, black and white, and a reign of terror pervaded the county.

At length it was announced that on January 21, 1901, there was to be a march of the United Mine Workers. They were to assemble at Boxtown, on the I. C. Railroad, in great num-

Lindle et al. v. Commonwealth.

bers, from other counties and States, and march from mine to mine and force out the miners, take them by force and close all the mines.

The sheriff, by the advice of the county judge and county attorney, issued a proclamation calling for law and order and calling for this marching to desist, that such crowds of marching intimidators were unlawful. Miners had been fired upon, guards had been shot from ambush. The sheriff appointed deputies, swore them in, had them give bond. These men were paid by the mine owners, who did not wish to place this expense on the county. The defendant, J. B. Lindle, was appointed deputy sheriff with the approval of the county court, also Lucien Bassett, both peaceable, sober, discreet citizens of the county. Johnson Williams was the duly elected constable. These officers, hearing of this contemplated movement, went to Boxtown as conservators of the peace. Gathered there on that day were 110 union men. They first went into a house they had there and came out in marching order and started on their march, saying they were going to another town where there was a larger house to hold a meeting. It is a part of current history that these highway marches are the usual means resorted to by these imported agitators for intimidating miners, exciting terror and provoking conflicts. Eleven witnesses for the defense swear that the purpose of the march was to force out the miners. Threats were made by the most violent; many of them were armed. In any event it was necessary that some officers of the law should be near by to preserve the peace. Lindle summoned his posse and met deputy Bassett and constable Williams at Boxtown. They said nothing, and did nothing until the armed crowd started out on its boasted march of intimidation. Then Lindle went to the leader, Kissinger, and in a gentlemanly way advised him of the sheriff's order and began reading the proclamation. Kissinger said, "Don't bother me with that foolishness; go to the front leaders." Lindle accordingly rode along the advancing column, talking to them in a friendly way, and reaching the front leaders, Henry Taylor, Wes Cook and Bill Cook, said to them: "Gentlemen, I think you are violating the law," and began reading to them the sheriff's proclamation. They jeered him and declined to stop. Lindle and Bassett then agreed to order them under arrest, but not to forcibly take charge of them if they objected. Pursuant to this agreement they rode to the front—Lindle, Bassett and three of his posse. Lindle and Johnson dismounted. Lindle told the front leaders, Henry Taylor, Wes Cook and Bill Cook, they might consider them-

Lindle et al. v. Commonwealth.

selves under arrest, and began to read the concluding part of the sheriff's proclamation. This was all done in a peaceable, quiet way, without show of force or display of weapons. All agree that at this point Henry Taylor, who, with Wes and Bill Cook, was standing facing Lindle, slipped his right hand into his right hip pocket, pulled his pistol and stealthily passed it into his left hand. From this point the witnesses differ. A number of the Commonwealth witnesses try to leave the impression that Taylor presented his pistol to Lindle in a friendly way and thereupon Lindle immediately fired. The other witnesses say that Taylor stealthily passed his pistol to Bill Cook, who thereupon fired the first shot and Taylor fired almost immediately his other pistol. In the conflict Taylor was killed and Lindle's face was severely powder-burned, and Ed Johnson's horse at the first shot was struck in the forehead. Twelve witnesses state that Cook fired the first shot. Cook was a hot-headed, dangerous man, while Lindle was cool, discreet and peaceable. The first thing that Lindle sees, while reading the proclamation, is the flash of a pistol and hears the declaration of this man Bill Cook: "I will kill the damn son of a bitch." This shot burnt one side of his face. Immediately another flash from Taylor's pistol burnt the other side of Lindle's face. This powder was afterwards picked out of his face by Dr. Nesbit.

The foregoing were substantially the facts proven on the trial.

We claim the court erred grossly in overruling defendant's motion for a continuance on account of the absence of a number of witnesses and of their want of opportunity to investigate the character of the witnesses for the Commonwealth, of whom defendants had no information. The court overruled the motion for a continuance without their having compulsory process to compel their witnesses to attend or time to execute it, if given. The court would not permit a supplemental affidavit to be filed as to the testimony of absent witnesses whose names were by mistake omitted from the affidavit first filed.

The court erred in permitting counsel for the Commonwealth to refer to the affidavit filed by defendants and admitted as the testimony of the absent witnesses, as having been admitted not as true, but merely to obtain a trial, saying that it was the statement of what the defendants said they could prove by the witnesses, all against the objection of defendants.

The court also erred in refusing to admit competent evidence offered by defendants, and in admitting incompetent evidence offered by the Commonwealth against defendant's objection.

Lindle et al. v. Commonwealth.

The court erred in giving instructions to the jury asked by the Commonwealth, and in refusing instructions asked by the defendants.

The court erred in permitting the attorney for the Commonwealth, in his closing argument in reference to the affidavit for a continuance, to say: "We admitted that if these men were here they would swear to it, and we did that in order to get a trial at this term and not be put off from year to year. Take it for what it is worth, and I will say add them to the others and you can not afford to believe on a deposition of that kind that fifteen honest men or eight honest men swore falsely to imprison a man for life or hang him." To which the defendants objected at the time and moved to exclude the objectionable remarks, which the court refused to do.

JOHN L. GRAYOT, COMMONWEALTH'S ATTORNEY FOURTH DISTRICT, R. Y. THOMAS, JR., JONSON & JENNINGS AND W. H. YOST FOR COMMONWEALTH.

Many of the coal mines in Western Kentucky are operated by laborers belonging to an organization known as the United Mine Workers of America. In November, 1900, certain members of this order began canvassing among the miners of this county to induce them to join this organization. All this work was done in a peaceable manner by argument and persuasion. No threats were made, no blood shed, no property injured, but their work raised the ire of the coal operators of the county. They were refused admission into the towns where the mines were located. The right of free speech was denied them, and they were ordered by certain officials of the county not to assemble together or to march along public highways. In January, 1901, about 100 of them assembled in a building at Boxtown, to listen to speeches being made by Kissinger, one of the officers, when armed guards of the coal companies began to appear, and, in order to avoid trouble, these men attempted to march to a building two and one-half miles away, which they had leased, when they were halted by the appellant, Lindle, a deputy sheriff, who was an employe of the St. Bernard Coal Company, accompanied by the other appellants as his posse, every one of whom was an armed guard of the same company.

Appellants complain that the court erred in refusing to grant them a continuance on account of the serious illness of Hon. Otway Waddell, the father of C. J. Waddell and father-in-law of C. J. Pratt, two of their attorneys, both of whom were present during the whole progress of the trial. A continuance was also asked on account of the absence of several witnesses em-

Lindle et al. v. Commonwealth.

braced in an original affidavit which the Commonwealth consented might be read as a deposition, and procured the attendance of all of them except Horton, Woodruff, Robinson, Matheny and Lafforon.

A supplemental affidavit was also tendered, which the court refused to allow to be filed because it did not state facts which authorized a continuance.

They complain of the court in excluding incompetent evidence which they offered, and objected to competent evidence introduced by the Commonwealth.

They also complain of the attorney for the Commonwealth and his co-counsel in referring to and commenting on their affidavit filed for a continuance and of certain remarks of the attorney for the Commonwealth in his closing argument.

We claim that the court properly instructed the jury on the whole law of the case—that there are no errors in the record prejudicial to defendants and that the judgment should be affirmed.

### AUTHORITIES CITED.

Clark's Crim. Procedure, 414; Henderson v. Com., 15 S. W. Rep., 782; Ataway v. State, 31 Tex. Crim. Rep., 475; Earp v. Com., 9 Dana, 301; Mackey v. Com., 80 Ky., 345; Unsel v. Com., 87 Ky., 368; Powers v. Com., 61 S. W. Rep., 735; Com. v. Glass, 21 Ky. Law Rep., 819; Carlton v. Com., 13 Ky. Law Rep., 946; Galloway v. Com., 7 Ky. Law Rep., 165; Behler v. State, 13 N. E. Rep., 272; Farris v. Com., 14 Bush, 362; Hilton v. Com., 13 Ky. Law Rep., 158.

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING.

The appellant, J. B. Lindle, was indicted by the grand jury of Hopkins county for the murder of Henry Taylor, which it is alleged was committed pursuant to a conspiracy entered into with the other defendants, who were present at the time of the homicide, and aided, abetted, encouraged, and incited the said Lindle to kill the deceased. A joint trial before a jury resulted in a verdict and judgment sentencing the appellants Lindle, Johnson, and McIntosh to the penitentiary for a term of two years, which we are asked to reverse for numerous alleged errors.

A short statement as to the conditions prevailing in

Hopkins county immediately preceding the homicide is essential to a proper understanding of the legal questions involved.   There is operated in Hopkins county 12 large coal mines, which produce about one-third of the total coal output of the entire State.   These mines had been operated for many years by "nonunion laborers," while all the coal mines in Western Kentucky, outside of Hopkins county, were operated by laborers belonging to an organization known as the United Mine Workers of America.   On the 18th day or April, 1900, the operators and miners of the Western Kentucky coal field met in joint session at Central City, and it was agreed that the price for mining coal should be increased 13 2-3 per cent.; and it was further stipulated that this scale of wages should be supplanted by a new scale, equivalent, under like conditions, to any rate of wages in excess of such scale which the United Mine Workers of America might enforce uniformly throughout the Western Kentucky district; and it was also stipulated that, in the event of the nonunion mines in the Western Kentucky competitive district, representing not less than 80 per cent. of the normal output of said nonunion mines, being on a strike, and closed down, so that no coal should be produced for market for 30 consecutive days, then the scale should be supplanted by a scale of 80 cents per ton for mining over the rates fixed in the Indianapolis scale of 1900, and that these rates should continue during the period of such strike, shut down and nonproduction of coal.   This agreement was signed by J. D. Woods, president of the United Mine Workers and by a committee representing the mine owners.   Soon after its execution, active steps were taken by the United Mine Workers to induce the nonunion mine workers of Hopkins county to become members of their organization.   In No-

vember, 1900, J. D. Woods, the president of the organi-
zation, came in person to the county of Hopkins, accom-
panied by quite a number of prominent leaders in his
orginzation. They at once began a most persistent and
aggressive movement to induce the Hopkins county mine
laborers to join the organization, with the purpose of set-
ting on foot. a strike, which would result in closing the
Hopkins county mines in accordance with the Central City
agreement. This movement on the part of Woods and his
confreres was vigorously resisted by the mine owners, and
resulted in considerable friction and bad feeling. Finally,
for the avowed purpose of protecting their property against
the United Mine Workers, they employed and armed nu-
merous guards. These conditions gradually grew more
tense, and the mine owners applied to the sheriff of the
county to appoint some of the guards deputy sheriffs, which
he did. Among the persons so appointed was the defend-
ant, J. B. Lindle and Lucien Bassett. After their appoint-
ment as deputy sheriffs, their salaries were paid by the
mine owners, and the only official duties which they were
called upon to discharge were to preserve peace and order
in the county. On the 24th of November, 1900, C. H.
Hankins, the sheriff of Hopkins county, after consultation
with other county officers, issued the following proclama-
tion: "Whereas, I have received information from many
of the coal miners of Hopkins county, and from other re-
liable sources, and which I have every reason to rely upon,
that there are now congregated in this county many per-
sons, some citizens of this county, many citizens of other
counties of this Commonwealth, and many from other
States, with the avowed purpose of compelling the miners
now at work in the many coal mines in this county to quit
their work and employment against their will; that the.

Lindle et al. v. Commonwealth.

said persons propose to accomplish their purpose by threats
of personal injury to the miners and mine property, and
other force and violence, and many laborers in the mines
have applied to me for protection; and believing that such
evil-disposed persons will proceed to do the things threat-
ened unless warned and prevented from doing so, and be-
lieving that the peace of the county will be broken, and
the citizens of the county greatly disturbed, and bloodshed
probably result, unless prompt steps are taken to preserve
the peace, and being determined to see to it that the law is
enforced, and every citizen of the county is protected in
his rights, liberty and property, from an illegal interference
from any person or persons, and being determined to pro-
tect every one employed in the mines or elsewhere in his
rights to peaceably quit or peaceably follow any employ-
ment in which he may be engaged: Now, I, therefore,
command said persons now here, and those to come, to de-
sist from their said purpose of interfering with any per-
son, in his right to labor in the mines, by intimidation,
threats, or violence, or any other illegal manner, and fur-
ther command them that they shall not congregate in pub-
lic places in the county, or march through the county in
squads, or crowd in a threatening manner, or in any man-
ner, or in any way abuse or attempt to put any citizen of
the county in fear, or in any way break or disturb the
peace of the citizens of the county; and the persons are
warned that any attempt on the part of any of said persons
to do any of the things they are herein commanded not to
do will result in the arrest and punishment of the party or
parties so offending, and all other parties associated with,
aiding, abetting, or counseling the parties so offending."
The issual of this proclamation by the sheriff was appar-
ently futile. The United Mine Workers continued zeal-

ously to recruit their organization in Hopkins county.
partly by importations from Muhlenberg and other coun-
ties, and partly by recruits from the ranks of the nonunion
miners employed in the various mines of the county. It
is insisted for them that they used only peaceful means to
accomplish these ends; that they indulged in no threats,
violence, or injury to property; while it is the contention
of the mine owners that they supplemented persuasion
and argument by threats that the mines would be dyna-
mited, and the homes of the employes blown up, and that
they would be taken out of the mines by force. Some time
previous to the 21st day of January, 1901, it was rumored
throughout the county that on that day the United Mine
Workers would assemble in force at the village of Box-
town on the Illinois Central Railroad, and would march to
the Carbondale mines, and take possession of them, and
compel its employes to go with them to the Crab Tree
mines, for the purpose of taking possession of
them and, thus gathering force proceed from mine
to mine until all the coal mines of the county
were closed up. The attention of the appellant,
J. B. Lindle, was called to these rumors by the super-
intendent of the Carbondale mines and other parties, and
he was requested to be on the lookout, and protect them
from the threatened violence. The testimony shows that,
on the day in question, Lindle summoned Wade McIntosh,
Ed Johnson, and Scott Penrod to accompany him as a
posse to Boxtown; that there he met Bassett. When he
arrived at Boxtown, he found that about 100 members of
the United Mine Workers had assembled in a building
to which only the membrs of the organization were ad-
mitted, and where they were addressed by one Kissinger
and other members of the organization. No steps were

taken by Lindle and his posse to interfere with the meet-
ing.    At about half past two o'clock in the afternoon, the
members of the organization came from the house, and
formed in column, three abreast, and started in the direc-
tion of the Carbondale mines.    After they had gotten well
under way, Lindle and his posse mounted their horses,
and started after them, and the testimony shows that as
soon as he overtook the rear of the column he notified
Kissinger, one of the leaders, that it was unlawful for
them to march through the country in the manner in which
they were, and also called their attention to the proclama-
tion of the sheriff, and that he continued to repeat these
statements as he passed along the line of the marchers.
Finally, his posse got in front of the column, and rode
along until they arrived at a point in the road known as
"Carbondale Crossroads."    When the column arrived at
this point they turned into the mouth of what is known
as the "Carbondale Lane," which leads directly to the mines
and tenant houses of the company.    At this point, Lindle
and his posse rode in front of the column, and Lindle and
Johnson dismounted, handing their bridle reins to Bassett
and McIntosh, who remained seated upon their horses.
The testimony as to what occurred at this point is conflict-
ing.    The witnesses for the defense testify that Lindle
notified the men in the column that they were violating the
law, and that he would have to arrest Henry Taylor, Bill
Cooke, and West Cooke, who were marching at the head of
the column, and that he began immediately to read the pro-
clamation of the sheriff, and that while so engaged Henry
Taylor drew a pistol from his pocket, and passed it to
Bill Cooke, who immediately fired at Lindle, remarking
at the same time that he would kill "the God damn son of
a bitch," and that immediately Henry Taylor also fired

at him; that as a result of this shot Lindle's face was pow-
der burned; and that a fusilade immediately followed, which
was participated in by Lindle and his two posse men, John-
son and McIntosh, on the one side, and Henry Taylor, Will
and West Cooke, and numerous other members of the
United Mine organization on the other side. In this com-
bat, which lasted only a moment or two, Taylor and Bill
Cooke were killed. The witnesses for the Commonwealth
testify, in substance, that when Lindle got off of his horse
he said, "This mob must be disbanded; you can't go any
further;" that Henry Taylor said, "All right, I do not resist
arrest," and immediately drew his pistol from his pocket,
and handed it, butt foremost, to Lindle; that Lindle im-
mediately drew his pistol and fired on him; that Bill Cooke
at this point took the pistol out of Henry Taylor's hand,
and said to Lindle, "You son of a bitch, how can we stand
that?" that Lindle then shot at Bill Cooke, and a general
fusilade ensued, which was participated in by both parties,
and which resulted in the killing of Taylor and Bill Cooke.

We will now consider the alleged errors of the court
upon the trial relied on for reversal. First, the defend-
ants asked a continuance of the case upon several grounds,
and filed their affidavits in support thereof. The affidavit
states, in substance, that the Commonwealth during the
term of the court, and only two days before the trial be-
gan, caused numerous witnesses to be subpoenaed whose
names did not appear at the foot of the indictment; that
they did not know that any of these persons would be
called to testify against them, and had not had time or
opportunity to investigate their character, nor to ascer-
tain what facts they would testify to with reference to the
homicide; that they were all members of the Mine Work-
ers' organization, and that a widespread conspiracy had

been formed in that organization in Hopkins county to convict the defendant by perjured testimony; that they had prepared their cases with the view of meeting the testimony of the witnesses whose names appeared at the foot of the indictment, and who had testified upon the motion for bail, many of whom had admitted upon cross-examination that Cooke and Taylor fired upon them first, and whose testimony they could successfully impeach by showing that they had made conflicting statements; that in abandoning the witnesses at the foot of the indictment, and summoning an entirely new set, they were taken at a great disadvantage; that if they were given time they could impeach the general reputation of many of them for truth and veracity, and show that they had made statements, shortly after the difficulty in which Taylor was killed, that Cooke fired the first shot.   The affidavit also asked a continuance upon the ground that numerous of the witnesses for the defense were absent, and other causes which it is not necessary for us now to consider.  While we would not lay it down as a general rule that a defendant was entitled to a continuance solely because the Commonwealth had subpoenaed, with a view of introducing, witnesses whose names were not at the foot of the indictment, under the peculiar facts of this case we are of the opinion that the defendant should have been granted the continuance on this ground.   Substantially all of the witnesses for the Commonwealth, both those whose names were at the foot of the indictment and those who were subsequently subpoenaed to testify in the case, belonged to the United Mine Workers' organization, and had participated in all the acts and demonstrations of that order which culminated in the tragedy of the 21st of January, 1900, and the inference was not unreasonable that their testimony might be

colored by their sympathies, associations, and prejudices. Many of them were strangers in the community, and the defense were at a great disadvantage upon the trial of the case because of their ignorance of the character and antecedents of these persons, and which they would have been able to ascertain by the next term of the court if a continuance had been granted. They also complain that the circuit judge refused to permit them to file a supplemental affidavit in which it was stated that Mrs. Carrol "would testify that two of the witnesses who were subpoenaed by the Commonwealth had told her on the day of the killing that Bill Cooke had fired the first shot, and that the marchers intended to go to the Carbondale mines and force the miners out, and that the deceased had a pistol in his hand when he fell." We think the court did not err in refusing to allow this supplemental affidavit to be filed. No sufficient reason is stated why the facts contained therein were not set out in the original affidavit for a continuance, and besides the testimony of Mrs. Carrol was merely cumulative in character, and substantially the same facts were proven by numerous other witnesses.

It is also complained that the court permitted the Commonwealth to show that appellants had been employed as guards by certain coal companies previous to their appointment as deputy sheriffs. This testimony served in some degree to illustrate the motives that actuated appellants at the time of the killing, and we think was competent.

And for the same reason we think the court erred in refusing to permit the defense to prove declarations made by Pres Cummings, Jack Wright, and other members of the United Mine Workers' association as to the plans and purposes of the organization with reference to closing up the various mines in Hopkins county, made shortly before

Lindle et al. v. Commonwealth.

the 21st day of January, 1900, and the declaration made by them to nonunion miners that if they did not cease to work, peaceably, they would be forced to do so.

And the court erred in refusing to allow the defendants to prove by Stewart Miller the execution of the contract of April 18, 1900, at Central City between the operators and union mine workers. This contract, more than any other testimony offered in the case, shows the aim and purpose of the order in going into Hopkins county, and the jury were entitled to have it before them. And it was competent for the defense to show that Kissinger, Chappell and Nichols were leaders in the organization, and that they were armed when coming from the scene of the conflict.

The court also erred in permitting the Commonwealth's attorney, at the close of the defendants' testimony, to recall the defendants, and ask them if they did not, in their affidavit for a continuance, state that certain witnesses would prove certain facts, reading aloud from the affidavit to show what these facts were, and then to ask them if the witnesses were not present. These statements purported to be the statements of witnesses who, after the affidavit was filed, appeared in court, and were not introduced by appellants. The only purpose such a line of questioning could subserve was to discredit the statements of that part of the affidavit which was read, which purported to state the testimony of absent witnesses. Appellants were entitled to be tried by the testimony which was actually introduced upon the trial, and, having been refused a continuance on the condition that the statements of the affidavits as to the testimony of absent witnesses should be read as their deposition, there should have been

no allusion to statements contained in the affidavit as to the testimony of witnesses which was not actually read to the jury, nor should the Commonwealth's attorney have been permitted to state to the jury motives which actuated him in consenting that the affidavit of the defendants should be read as the testimony of the absent witnesses. Numerous exceptions gven to the admission and rejection of testimony and the general conduct of the case upon the trial are relied on, but, as they are not likely to occur again, we deem it unnecessary to consider them.

We will now consider the instructions given to the jury upon the trial. The first five instructions are all based upon the theory of the Commonwealth as to the commission of the offense.

While the seventh, eighth, and ninth instructions are probably correct as abstract propositions of law, they are calculated to divert the attention of the jury from the facts upon which the guilt or innocence of the accused really turned. Questions as to the relative rights of the United Mine Workers to assemble and march in a peaceable manner, and of the right of the operators of the mines to protect their property, from violence and invasion, should not have been submitted to the jury.

The sixth instruction is erroneous, and was prejudicial to the defendants, because it absolutely ignores the whole theory upon which the defense was predicated, that Lindle and those with him were acting as officers, in the discharge of what they conceived to be their official duty. An officer of the law, arresting one for a felony, occupies an entirely different position from a private person; and if, in making an arrest, he is forcibly resisted, he is not limited to the use of such force as was necessary to protect himself from death or great bodily harm, but can stand his ground, and use such

force as is necessary, or apparently necessary, to over-
come the resistance offered, even to the extent of taking
life.

The tenth instruction is as follows: "If the jury believe
from the evidence that said union miners had assembled
at said place, and had confederated or banded themselves
together, for the purpose of intimidating, alarming, dis-
turbing, or injuring any person, or that they had confed-
erated or banded themselves together and went forth for
the purpose of molesting, injuring, or destroying any prop-
erty of another, then, in such case, they were guilty of
a felony, and the deputy sheriff, Lindle, and the other de-
fendants, had the right, and it was lawful for them, to
disperse such persons, and to arrest them without war-
rant, provided the defendant, Lindle, had reasonable
grounds to believe, and did in good faith believe, that said
Taylor and the others with him, had committed, or were
then committing, such a felony; and in such state of case
it was the duty of Taylor and others to disperse if com-
manded, and submit to arrest, if required, and the defend-
ants had the right to use such force as was reasonably
necessary to make the arrest; and if the jury believe from
the evidence that defendant Lindle, as deputy sheriff, had
reasonable grounds to believe, and did in good faith be-
lieve, that said Taylor, and others with him, acting in
concert, had confederated and banded themselves together
for the purpose of intimidating, alarming, disturbing, or in-
juring any person or persons or the property of any person,
and were then going forth for such purpose, then it was law-
ful for Lindle and his posse to arrest, or attempt to arrest,
said Taylor and others with him, even though in fact they
were not guilty of a felony; and if, in attempting to do so,
he was assaulted by Henry Taylor, or Cooke, or both, and

Lindle et al. v. Commonwealth.

he had reasonable grounds to believe he was in imminent danger of losing his life or suffering great bodily harm at the hands of said Taylor, or others connected with him, then the defendant Lindle had the right, and it was lawful for him, in the exercise of a reasonable judgment, to use such force as was reasonable and necessary, or apparently necessary to save his own life, or protect his person from great bodily harm, even to the taking of the life of said Taylor, on such grounds and under such circumstances the defendant, Lindle, is excusable, and the jury will acquit him." This instruction does not state the law. In the first place, it requires the jury to believe from the evidence that the union miners had banded themselves together and gone forth for the purpose or alarming, intimidating, and disturbing others, before it was lawful for the deputy sheriff and his posse to arrest or disperse them. This is an entirely erroneous and misleading statement of the law. The question was not what the jury might believe the purpose of the miners to have been in assembling, banding themselves together, and going forth, but what the defendants, as officers, believed, and had reasonable grounds to believe, their purpose was at the time of the attempted arrest. And, in the second place, the instruction tells the jury that if they believe from the evidence that Lindle, as deputy sheriff, had reasonable grounds to believe, and did in good faith believe, that Taylor, and others with him, were acting in concert, and had confederated and banded themselves together for the purpose of intimidating, alarming, disturbing, or injuring any persons or property, and were then going forth for such purpose, it was lawful for Lindle and his posse to arrest or attempt to arrest them, even if they in fact were not guilty of a felony. But in the latter part of the instruction the right of Lindle

to use such force as was reasonably and apparently neces-
sary to effect such arrest is made to depend upon a pre-
vious assault upon him by either Taylor, Cooke, or both
of them, and required that he should have had reasonable
grounds to believe that he was in imminent danger of losing
his life, or suffering great bodily harm, at the hands of
Taylor and others connected with him, before it was lawful
for him to take the life of Taylor.   If this is a correct state-
ment of the law, then peace officers, in attempting to dis-
charge the duty imposed upon them by their official posi-
tion, truly occupy a position of great peril. But fortunately
for them, and for the peace and good order of society, they
are placed in no such position.   All that the law required
of Lindle was that he should have in good faith believed,
and had reasonable grounds to believe, that Taylor, and
the others with him, had banded themselves together, and
gone forth armed, for the purpose of alarming, intimidat-
ing, or injuring any person or persons.   If this was true
he and the other defendants summoned by him had the
lawful right to disperse and arrest such person without
warrant, and to use such force as was reasonably neces-
sary to effect this purpose; and if Taylor, and those with
him, resisted arrest, it was lawful, if necessary to make
such arrest, to shoot the persons so resisting.   If, on the
other hand, Lindle, and those acting with him, did not in
good faith believe, and did not have reasonable grounds
to believe, that Taylor, and those with him, were then
going forth for the purpose of alarming, intimidating, dis-
turbing or injuring any person or persons, and they were
not acting in good faith in what appeared to be the dis-
charge of their official duty, but first began by shooting,
or making demonstrations to shoot, then they could not

rely upon the protection with which the law clothes officers, and be excused on the ground of self-defense.

For the reasons indicated, the judgment is reversed, and the cause remanded for a new trial consistent with this opinion.

Judge Guffy dissents from this opinion.

Chief Justice Paynter dissents from parts of this opinion.